[Civ. No. 2568.   Third Appellate District.—March 13, 1923.]

JOHN H. FLAGLER, Respondent, v. LEO KROONEN
et al., Appellants.

[1] VENDOR AND VENDEE—CONTRACT FOR SALE OF MINE—AGREEMENT
TO PERFECT TITLE—TIME—INTENT.—In this action to recover the
moneys paid under a contract for the purchase of an undivided
fractional interest in certain mining claims, notwithstanding the
contract provided that the vendors should proceed with due dili-
gence to perfect and acquire title to the property, "all to be
acquired within one year from date hereof," and further provided
that "in the event of the failure of" the vendors "to perfect title
as above stated, then the amount paid" by the vendee to the
vendors should be repaid, giving due consideration to all the
terms of the contract and viewing it in the light of the known
circumstances under which it was executed, it could not be held
that the parties intended to make time of the essence of the ob-
ligation of the vendors.

[2] ID.—MAKING TIME OF ESSENCE—INTENT.—In order to make
time of the essence of an obligation, it is not necessary that it
should be declared to be so in the words of the statute; but the
intent to make it of the essence of the contract must be clearly,
unequivocally, and unmistakably shown.

[3] ID.—DEFAULT—WAIVER BY CONDUCT.—Conceding that the vendors
under such contract were obligated to perfect the title within a

3.   Waiver of purchaser's right to rescind contract for purchase of
real property, note, 30 L. R. A. (N. S.) 872.

year, under penalty of losing their bargain, their default did not *ipso facto* terminate the contract, but they continued to be bound by its terms, at the option of the vendee, until the latter declared his intention to take advantage of the default; and where the vendee, knowing of the claimed default of the vendors and of the refusal of the latter to negotiate with other persons for the sale of the property, in the belief that they were bound by the contract with the vendee and that the latter intended to take the property, by his conduct and by the reasons given by his attorney for not completing the contract at the times requested by the vendors confirmed the vendor's belief that he would complete the purchase, equity would not permit him to take advantage of the alleged default of the vendors, but he must be held to have waived it by the course of conduct he pursued.

[4] ID.—DEFAULT BY VENDEE—ESTOPPEL.—Where the vendee was himself in default in the payment of the interest on the deferred payments under the contract, he was not in a position to maintain an action based on the alleged subsequent default of the vendors in procuring title to the property within the time specified in the contract.

APPEAL from a judgment of the Superior Court of Riverside County. Hugh H. Craig, Judge. Reversed.

The facts are stated in the opinion of the court.

Milton K. Young and Frank L. Stobbs for Appellants.

Carnahan & Clark for Respondent.

FINCH, P. J.—The parties entered into a contract dated June 16, 1916, by the terms of which plaintiff agreed to purchase from defendants an undivided two-thirds interest in certain mining claims, consisting of clay beds, for $33,333.32; $3,000 cash on execution of the contract, $2,000 six months from date thereof, and installments of $7,083.33 a year until the whole purchase price was paid, the first of such installments to be paid one year after the date of the contract, "deferred payments to draw interest at the rate of five per cent per annum, interest payable semi-annually." The contract contained the following:

"Provided, however, that said first parties [defendants] shall proceed with due diligence to perfect and acquire title to all of the above described property from the United States Government and obtain patent thereof, or acquire title to

that portion of said property located in section 9 from the
Southern Pacific Railway Company, all to be acquired within
one year from date hereof, and all to be done at the sole
expense of said first parties except as otherwise herein pro-
vided.

"In case said first parties shall fail to perfect or acquire
title to said property within one year from date hereof, then
at the option of second party, the time of the said deferred
payments . . . may each be extended one year from the time
they become due as hereinbefore stated, and the deferred
payments . . . shall not draw interest for the length of time
said first parties have been unable to procure and perfect
title beyond the year above given, but said deferred pay-
ments . . . shall draw interest in such case from the time
said first parties perfect and acquire title to said property
as herein provided. And in case said first parties shall fail
to perfect and acquire title as herein provided, then . . .
said second party shall be released from all obligations in
law or equity to pay said indebtedness, . . . or any portion
thereof.

"The perfection of said title as aforesaid shall be evi-
denced by the certificate of Geo. R. Freeman, attorney at
law, of Corona, California, stating that the title to said
property is free and clear of encumbrances and free from
any defect, in the name of Leo Kroonen, before the first pay-
ment of $7,083.33 is made by said second party.

"In the event of the failure of the said first parties to per-
fect title as above stated, then the amount paid by said sec-
ond party shall be repaid by first parties to said second
party . . . and this contract shall be at an end.

"And the said parties of the first part on receiving such
payments aforesaid . . . agree . . . to execute and deliver
to said second party, or assigns, a good and sufficient
deed . . . and furnish and deliver to second party an ab-
stract of title or a certificate of title (at the option of the
second party) from a reliable abstract company, . . . said
title to be passed upon and certified to by said Geo. R.
Freeman as aforesaid.

"It is agreed between the parties hereto that from and
after the date of this instrument, all expense for obtaining
patent of said mines from the United States government and
development work that shall be done upon said mines, or

either of them, shall be done at the expense of the parties hereto in the following proportions, to-wit: Said first parties one-third of said expense, and second party two-thirds of such expense. . . .

"It is mutually agreed that the parties hereto may do such development work upon said mines from time to time as they may mutually agree upon."

Plaintiff paid the sum of $3,000 on the execution of the contract and $2,000 in the month of January, 1917. The court gave judgment in favor of plaintiff for the recovery of the $5,000 so paid by him on the ground that defendants had not perfected title within one year after the date of the contract. From this judgment the defendants appeal.

At the time the contract was executed the plaintiff knew that Kroonen's right to a patent was being contested; that the local land office had decided the contest in favor of Kroonen; that the general land office had affirmed the decision, and that the contestant had appealed to the Secretary of the Interior, and within a few weeks after the execution of the contract plaintiff was notified by his attorney that the Secretary of the Interior had affirmed the decision. June 9, 1917, the local land office issued to Kroonen its final receipt for the purchase price of the property described in the contract. On account of an error on the part of the local land office in allowing a homestead entry to overlap on one of Kroonen's claims and which was not cleared up until some time prior to September 22, 1917, Kroonen's patent was not issued until December 10, 1917. Plaintiff failed to make the first deferred payment of $2,000 when it became due but paid the same in the following January. He failed at any time, however, to pay interest on the $2,000 as provided in the contract, although Kroonen requested him to pay it at the time the $2,000 was paid. Neither did the plaintiff make payment at any time of the interest which fell due December 16, 1916, on the other deferred installments. At different times after the patent was issued Kroonen requested payment of two-thirds of the moneys expended by him in obtaining the patent and developing the property as well as other sums due under the terms of the contract. While such payments were not made as requested, the plaintiff at no time prior to November 29, 1918, intimated to Kroonen that he did not intend to com-

plete the purchase or that he would make the claim that Kroonen was in default in failing to perfect title within the time provided in the contract. On the contrary, the letters passing between plaintiff and his attorney indicate a purpose to conceal from Kroonen the knowledge that any such course was even contemplated. Such letters further indicate that plaintiff had not decided definitely, even in his own mind, prior to November 29, 1918, to take advantage of Kroonen's alleged default.

Freeman had been attorney for plaintiff for a number of years and continued to act as such in all the transactions between the parties. He acted as attorney for both parties in drawing the contract. He was attorney for Kroonen in procuring the patent. In all other matters he represented the plaintiff only. To hold otherwise would be to impute to the attorney, as will hereinafter appear, a course of unprofessional conduct which the evidence does not warrant. The plaintiff owned other properties in California, but resided in the city of New York. Mr. McCully, mentioned in some of the letters, was general manager of all of plaintiff's properties in this state and conducted, under plaintiff's direction, the negotiations leading up to the execution of the contract. July 18, 1917, Freeman wrote plaintiff as follows:

"In re Kroonen mines. I have just received a letter from Gladding, McBean and Co. of San Francisco, relative to joining in the construction and operation of a plant here as I discussed with you while you were here. They are desirous of testing these clays and want me to ship them 50 pounds each of the different kinds of clay. . . . I deem it advisable not to take the matter up with Mr. Kroonen at this time, and I thought if you would write me a letter requesting me to get 50 pounds of the different clays suitable for the purpose of making a test, Mr. Kroonen would comply with that request without asking any questions.

"Mr. Kroonen spoke to Mr. McCully the other night and thought the contract should be closed up. Mr. McCully told him he thought the contract did not warrant his conclusion in that regard in as much as I was to pass upon the title after the patent was obtained. He also told Mr. McCully he had an offer from Gladding & McBean to go in with him, but he did not disclose what the offer was. . . . From another source of information coming from Gladding & Mc-

Bean, I had heard, but I do not think the proposition was of any definite character. When Mr. Gladding was here at my office, he asked about Kroonen and his clays, and stated to another party in my presence, he did not think it was necessary to get any of Kroonen's clays as no deal could be made with him. I assumed, taking his remark to Mr. McCully and his remark in my presence, that Mr. Kroonen had told him that his mines were tied up and it would be of no use to negotiate a sale of his clays.''

August 10, 1917, plaintiff wrote Freeman:

''I think Gladding & McBean are quite right not to want to do anything with regard to this property, or a deal with us without first testing out the class of clays we have to offer them.

''On further consideration how would it place me towards Kroonen on this matter, should I write a letter now at this date, asking Kroonen to get 50 lbs. of the different clays for the purpose as suggested in your letter. Would it not have the effect from my standpoint that I admit the whole contract with Kroonen as being yet in existence? Whereas, Kroonen not getting out title according with his agreement, made it a debatable question, whether I am in duty bound, or in any way obliged to carry out a further deal with him on this clay-bank.

''If you think it advisable, possibly Mr. McCully might get this clay, and so send it forward on his own responsibility, rather than commit me in any way as furnishing this clay to the Gladding & McBean Co. Think this over, and let me know further.

''Don't say anything to McCully in regard to the position that I take in this matter, as, of course, you understand Kroonen having failed to carry out his part of the contract on account of the long delay, etc., gives me the opportunity to withdraw, but you don't want to discuss this question of mine with McCully.''

January 3, 1918, Freeman wrote plaintiff that Kroonen had received his patent and stated: ''I presume he will now be ready and is ready to have the title to these mines examined and passed upon, and is ready to take the matter up with you.'' February 1, 1918, Kroonen sent Freeman a statement of the amount due him under the contract and stated: ''Mr. Flagler could, if he desired to, put off the pay-

ment of the original payment until June but I do not think
that he will take advantage of this.'' February 12, 1918, Free-
man forwarded Kroonen's letter and statement of amount
due him to plaintiff and wrote: ''Kindly advise what you
wish to be done in the matter. Mr. Kroonen has spoken to
me several times in regard to this matter, and he has been
in hopes you would come to California and take this matter
up personally. I just learned yesterday that the Los An-
geles Pressed Brick Company had a ten year lease on the
Elsinore clay beds and that these clay beds were playing
out and that they were hard pressed to get the proper kind
of clay. . . . I am of the opinion that eventually the Kroonen
clay beds will be the principal clay beds in Southern Cali-
fornia as both to quantity and quality.''

February 19, 1918, plaintiff wrote Freeman:

''In yours of the 12th inst. regarding Kroonen claim, I
mentioned to you some time since when in California in
regard to Mr. Kroonen's delay and failing to produce proper
and clear title, that I didn't propose to go any further in
connection with this subject with Mr. Kroonen . . . and I
had supposed that you had mentioned the matter more or
less to him long ere this. I recognize what you say with
reference to the Elsinore clay beds, if this is true as alleged
it would seem to me by approaching these people in connec-
tion with the Kroonen bed, that something may be made of
it, wherein I would get back my $5,000 that I advanced to
Mr. Kroonen. When I visit California I will confer further
with you on the subject matter.''

February 26, 1918, Freeman wrote plaintiff:

''I note what you say about the Kroonen matter. Mr.
Kroonen has spoken to me several times as to what you pro-
posed to do in regard to the matter. I always told him that
you would not do anything until the title was perfected as
per agreement. As soon as patent was received he began
to urge the closing of the deal as per contract. I told him
I had no authority to act in the matter for you as to what
you would do in regard to the matter. He then sent to me
the statement and the letter which I sent you on the 12th of
February.''

Thereafter, on May 7th, Kroonen sent Freeman a state-
ment of the amount which would be due June 16th and re-
quested that the same be paid promptly when due. July

30th and again on October 23d Kroonen sent plaintiff similar statements and demands for payment. In November, 1917, plaintiff paid Kroonen $1,100, for services rendered in preparing plans and specifications for a chemical plant, without any suggestion that Kroonen was indebted to plaintiff. Had plaintiff then considered the contract sued on at an end and that Kroonen was indebted to him in the sum of $5,000, he naturally would have made such claim. With full knowledge of the foregoing facts and knowing that Kroonen believed that the contract was in full force as to both parties, the plaintiff maintained silence until November 29, 1918, when, for the first time, he denied liability under the contract and claimed the right to recover the purchase money which had been paid. The only fair inference from the plaintiff's conduct is that he was endeavoring to maintain a position which would enable him to complete the purchase or take advantage of Kroonen's alleged default as might finally appear to be most advantageous.

[1] Giving due consideration to all of the terms of the contract and viewing it in the light of the known circumstances under which it was executed, it cannot be held that the parties intended to make time of the essence thereof. The contract shows on its face that the parties contemplated that more than a year might be required to perfect the title, for the plaintiff was given the option to extend the time of payment if the title was not perfected within that time. Plaintiff's own attorney conducted the proceedings to secure the patent and failure to issue it at an earlier time seems to have been due to delays in the land office department over which the defendants had no control. Plaintiff relied for recovery upon the fourth quoted paragraph of the contract, providing for a recovery of the amounts paid by plaintiff "in the event of the failure of the said first parties to perfect title as above stated." The contract was drafted by an experienced attorney and, in view of the other provisions thereof, if the parties intended to make time of its essence, it is strange that they did not expressly so declare or make plaintiff's right of recovery dependent upon defendant's failure to perfect title within the "time" stated in the contract instead of "as above stated," since the latter term is equally applicable to more than one provision. [2] "We do not think it is necessary, in order to make time of the

essence of the obligation, that it should be declared to be so in the words of the statute; but the intent to make it of the essence of the contract must be clearly, unequivocally, and unmistakably shown." (*Miller* v. *Cox,* 96 Cal. 339, 344 [31 Pac. 161, 163].)

[3] If it be conceded that the defendants were obligated to perfect the title within a year, under penalty of losing their bargain, their default did not *ipso facto* terminate the contract, but they continued bound by its terms, at the option of the plaintiff, until he declared his intention to take advantage of the default. The plaintiff could not indefinitely so hold the defendants bound without waiving his right to rely upon the default. Knowing that Kroonen was refusing to negotiate with other persons for the sale of the property, in the belief that he was bound by the contract and that plaintiff intended to take the property, the plaintiff, by his conduct and the reasons given by his attorney to Kroonen for not completing the transaction at the times requested, confirmed the latter's belief that plaintiff would complete the purchase. Under such circumstances it would be inequitable to permit plaintiff to take advantage of the alleged default, but he must be held to have waived it by the course of conduct he pursued.

Plaintiff's cause of action is based upon the theory that defendants made default in the performance of the contract and that, by reason of such breach, the plaintiff had the right to treat the agreement of sale as abandoned and to sue on the other terms of the contract for recovery of the moneys paid thereon. There is no pretense that plaintiff ever demanded or that defendants refused performance or that title was not perfected by the 10th of December, 1917, at the latest. All defects in the title had been cleared up at some time prior to September 22, 1917, the exact time not appearing from the record, and nothing remained to be done thereafter but the mere formality of issuing the patent. Plaintiff, however, was himself first in default and continuously so thereafter. He defaulted in payment of the interest falling due December 16, 1916, although Kroonen demanded payment of the interest on the $2,000 installment when that installment was paid, which was long before defendants' alleged default. No offer of payment was made by plaintiff in his complaint or otherwise and the judgment

does not require such payment to be made. **[4]** Being himself so in default, plaintiff was not in a position to maintain an action based on the alleged subsequent default of the defendants. (*Rosenthal* v. *Silveira,* 42 Cal. App. 637 [184 Pac. 58].)

The judgment is reversed.

Hart, J., and Burnett, J., concurred.