[Civ. No. 22587. First Dist., Div. One. Nov. 14, 1966.]

RUDOLPH ALFINITO et al., Plaintiffs and Respondents, v. MAURY S. SATER et al., Defendants and Appellants.

HARRY GOLDHAMMER et al., Plaintiffs and Respondents, v. MAURY S. SATER et al., Defendants and Appellants.

(Consolidated Cases.)

366

Eisner & Titchell, Richard D. Maltzman, Haskell Titchell, Norman A. Eisner, Baum & Aran, and Robert M. Aran for Defendants and Appellants.

Crist, Peters, Donegan & Brenner, John M. Brenner and Elster S. Haile for Plaintiffs and Respondents.

SIMS, J.—Defendants have appealed from adverse judgments in separate actions, consolidated for trial, in which plaintiffs were granted decrees of specific performance of an alleged obligation to convey interests in land to the respective plaintiffs.

The controversy revolves around the interpretation of a certain agreement of joint venture which was executed by all of the parties. The basic questions are: (1) were the plaintiffs' rights to purchase an interest in the land which was the subject of the joint venture dependent upon the commencement of construction or other conditions relating to the development of the land; (2) if so, did plaintiffs fail to perform such conditions, did they substantially perform such conditions, or was performance of such conditions frustrated and excused because of the conduct of the defendants; and (3) did the plaintiffs exercise such rights as they had to secure a conveyance of an interest in the property within the time and in the manner contemplated by the agreement? Other contentions relate to the propriety of granting specific performance under the circumstances of this case. An examination of the record reflects that these issues were resolved in favor of plaintiffs in the trial court's findings of fact and conclusions of law. Insofar as the findings are factual they are sustained by the evidence in the case; and insofar as they depend upon the construction and interpretation of the agreements which were executed by the parties, that construction and interpretation is confirmed on an independent review. (See *Parsons* v. *Bristol Dev. Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839].) The judgment must therefore be affirmed.

*Summary of Facts*

The *dramatis personae* of this epic of the era of transmutation of the use of land from husbandry to huckstering consist of the following: plaintiffs Rudolph Alfinito, a restaurateur, and his wife Clara; plaintiffs Harry Goldhammer, a real estate investor and developer, and his wife Clara; defendants Maury S. Sater, a wholesale jeweler, and his wife Mollie; and defendants Joseph H. Pollock, a physician and surgeon, and his wife

Helene. The wives play no part in the controversy except inso-
far as they were required to and did subscribe some of the
agreements executed by their respective husbands. The princi-
pals will be referred to by their surnames, and for convenience
without any attempt at legal characterization, Alfinito and
Goldhammer may be referred to collectively as ''the develop-
ers,'' and Sater and Pollock as ''the investors.''

Alfinito had met Sater about 1958 through an acquaintance
with Sater's son James, with whom Alfinito was subsequently
engaged in the frozen dessert business. In 1959 Alfinito was
instrumental in purchasing some property which Sater put in
trust for his sons.

In December 1960 or January 1961, Alfinito purchased from
Goldhammer a one-half interest in certain unimproved land
consisting of a vacant lot on Alice Avenue in Santa Clara
County, which is hereinafter referred to as the Alice property.
The two approached Sater for financing and as a result a joint
venture agreement dated February 17, 1961 was executed.

Thereafter, the developers found the property which is the
subject of this action and is referred to as the Alviso property.
They placed a $2,000 deposit on the property and recom-
mended to Sater that it be purchased. The investors approved
and as a result an ''addenda'' to the February 17, 1961 agree-
ment was prepared and executed, and a second joint venture
agreement referred to as the agreement of April 21, 1961 was
signed. The exact date of the execution of this agreement and
also the date of execution of an ''addenda'' thereto are dis-
puted.

The original agreement for the Alice property, February 17,
1961, provided that the developers would put up the land and
each have a one-third interest in the venture, and that the
investors would contribute $70,000 for the construction of im-
provements on the land and each have a one-sixth interest. By
a first ''addenda'' it was provided that in making decisions
each of the developers would be considered as one party, and
that the investors would collectively be considered as a single
party. By the second ''addenda'' each of the four is given an
equal undivided one-fourth interest in the Alice property ven-
ture and certain projected ventures, including the Alviso prop-
erty. This instrument portends that the investors will con-
tribute $75,000 to the purchase of the Alviso property;[1] that

---

[1]This provision reads: '' (a) An 28 acre parcel on Alviso Av. On sign-
ing this agreement, a check for $75,000 will be given to purchase this
tract by Sater & Pollock.''

"all future monies required for land and development will be on an equal basis—one fourth each"; that it is contemplated that in financing further purchases and improvements resort will first be had to funds available from borrowing on and from net rentals from the Alice property.[2] By this "addenda" the developers agreed "to devote all of their efforts and time in the development of these properties."

The subsequent agreement which refers expressly to the Alviso property recites that the parties "do hereby agree to form, and do hereby form, a joint venture for the specific and limited purpose of the improvement of the real property above described for industrial purposes and the erection on said real property of industrial buildings." The investors agree to contribute the sum of $75,000 to purchase the property and it is provided that title is to be taken in their names as tenants in common.

The record shows that the total purchase price of the property was $293,000; that it was contemplated $108,000 would be received from a condemnation award for 8 of the 28 acres involved; that of the balance of $185,000, $75,000 should be paid down and the balance in two equal installments due respectively one and two years after the sale was closed. Notes secured by deed of trust on the property were to be and were given to secure the payment of the $108,000 and the $110,000 respectively.

The Alviso property agreement expressly refers to the February 17, 1961 agreement and the addenda thereto. It incorporates the duties and obligations set forth in the prior agreement, and further provides: that the investors will convey equal interests to the developers upon their contributing "the sum equal to" the investors' contribution (see fn. 5, *infra*); that the developers release, relinquish and quitclaim any and all interest if no construction is commenced and no contribu-

[2]The first such provision follows that quoted in footnote 1, and reads: "However, according to the Joint Venture Agreement dated Feb. 17, 1961—all future monies required for land and development will be on an equal basis—one fourth each, provided such monies is [*sic*] not available from take-out loan on Alice Avenue."

The second recital states: "Now, it is further understood that any and all monies received on the financing of the Alice Property will be used to (a) Pay $10,000 to Alfinito (5000) and Goldhammer (5000) which money they have lent on the purchase of Terra Bella. (b) Use the balance of the money for financing purchase of the land—i.e., 28 acre tract and/or Diamond, Terra Bella, etc. Also, the money may be used to finance construction of buildings on these properties. Or, as the majority of the members decide."

tion is made by them (see fn. 6, *infra*); that the estate of a deceased developer would have certain rights; that in the event no construction is commenced the agreement will become null and void;[3] that moneys received from the Alice property venture shall be used to further the Alviso property venture; that the developers represent and agree that they will "devote a substantial amount of their time and energy in developing the above described real property"; and that when improved, the property should be sold or leased upon terms decided by a majority of the parties. The remaining provisions deal with the disposition of any funds that may be received from a sale or lease, and contain a covenant against assignment without consent.

The "Addenda to Joint Venture Agreement Dated April 21, 1961" confirms that each party is to have a one-quarter interest under the Alice property venture and future ventures. It, further provides: "The parties shall contribute equally any funds required in connection with additional ventures in which they participate together; provided that any funds available from the permanent financing of Alice Avenue, or other funds derived from any other ventures in which the parties participate jointly, shall be used for such purpose prior to requiring capital contributions from the parties." In, the event the majority determine that funds are to be withdrawn they are to be applied first, to reimburse the investors for the $70,000 and any other advances on the Alice property, secondly, to reimburse the developers for their $26,000 purchase price and any other advances for the Alice property, and, thirdly, to reimburse the investors for the $75,000 paid on the Alviso property. The determination of all matters for all ventures is lodged in the majority of the parties. The phraseology of the undertaking of the developers is revised.[4] The provisions for the release of the developers' interest is modified to fix a one-year limitation on the conditions therein contained (see fn. 6, *infra*); and the express condition predicated on failure to commence construction (fn. 3, *supra*) is deleted.

---

[3]This provision read: "It is specifically understood and agreed that in the event no construction is commenced on the above described property this agreement shall become null and void and of no force and effect."

[4]This provision reads: "Goldhammer and Alfinito shall devote a substantial amount of their time and energy in connection with the development of all joint ventures on a basis consistent with sound business judgment. Goldhammer and Alfinito agree that so long as they are jointly participating with Sater and Pollock in any venture, Goldhammer and Alfinito will not engage in any other real estate or construction projects."

The remaining facts are incorporated below in connection with the discussion of the contentions of the parties. Because the limitation on the time within which the developers could assert such rights as they had is directly related to the provisions creating those rights, the questions pertaining thereto will first be discussed.

### The plaintiffs' tenders were timely

Developers rely upon the investors' agreement to convey to each of them a one-quarter undivided interest in the property upon their contributing "the sum equal to" the latters' contributions.[5]

On this phase of the case the investors contend that the rights, if any, of the developers to contribute and receive a conveyance of an interest in the real property terminated one year after the execution of the agreement by virtue of the provisions of the agreement and the "addenda," which require that the contribution be made within one year.[6] This contention is dependent on the following postulates: that the original agreement was dated April 21, 1961; that the lan-

---

[5]These provisions read: "All of the parties recognize and are aware that there shall become due towards the purchase of the above described property, approximately $75,000 within one year from the date title is acquired. In connection therewith, it is specifically agreed, and it is of the essence of this agreement, that title to the above described property shall remain in the name of first party and second party until such time as the contribution of third and fourth parties towards this joint venture equals the contribution made herein by first party and second party. Upon third party and fourth party contributing to this joint venture the sum equal to first and second party's contribution, then first party and second party agree that they shall cause said real property to be conveyed and recorded as follows:

"A ¼ undivided interest in [each of the respective four parties].

"A policy of title insurance shall be issued insuring title as above stated free and clear of encumbrances except current taxes, a lien but not delinquent."

[6]The agreement provides: "Provided that no construction has commenced on the above described real property, and provided further that third and fourth parties have not contributed an amount equal to that of first party and second party towards this joint venture, third and fourth parties, for themselves, their heirs, administrators, executors and assigns, do hereby release, relinquish and quit claim any and all interest they have in and to the above described real property and in this joint venture to first party and second party."

The "addenda" added: "The paragraph on page 4 relating to the release and quitclaim of the interests of Goldhammer and Alfinito is modified to insert a one-year period therein, namely, that such release and quitclaim will be effective at the end of one year after the date of this agreement if (a) no construction is commenced on the Aliviso [sic] property and if (b) prior to such one-year Goldhammer and Alfinito shall have not then contributed capital equal to that of Sater and Pollock prior to such period."

374

guage of the "addenda" referred to the date of the original agreement rather than the date of the "addenda"; that, if not, the addenda was executed more than one year before the tenders; and that the tenders on April 23, 1962 were not timely despite the intervening weekend.

The investors contend that the developers were mere optionees and that their rights terminated under the principle that "the burden was upon the optionee to show strict compliance with the terms of the option agreement—including payment or tender of the amount specified within the time stated." (*Callisch* v. *Farnham* (1948) 83 Cal.App.2d 427, 430 [188 P.2d 775]; accord: *Rosenaur* v. *Pacelli* (1959) 174 Cal.App.2d 673, 676-677 [345 P.2d 102]; *Sheveland* v. *Reed* (1958) 159 Cal. App.2d 820, 822 [324 P.2d 633]; *Bourdieu* v. *Baker* (1935) 6 Cal.App.2d 150, 158 [44 P.2d 587]; *Wightman* v. *Hall* (1923) 62 Cal.App. 632, 633-634 [217 P. 580].)

▋ The court found that the original agreement was executed on or about April 21, 1961; that the so-called "addenda" was entered into approximately seven days thereafter; that "on Monday, April 23, 1962 [each of the developers] within the time required by the terms of said agreement and addenda, tendered to the joint venture the sum of $37,500.00 . . . pursuant to and in accordance with, the terms of said agreement and addenda, which sums so tendered equalled the $75,000.00 contribution made by [investors] in accordance with the terms of said agreement and addenda , . . ."

The evidence supports these findings. No dated copy of the original agreement was produced. The copy attached to the findings recites "made this —— day of April 1961." Some evidence was introduced to show that the original agreement was signed around April 23, 24 or 25, 1961. In view of the reference in the "addenda" to "Joint Venture Agreement Dated April 21, 1961," the fact that the parties originally stipulated that it was so dated and the use of that description in the telegram dispatched to the investors in the name of the developers by Goldhammer on April 21, 1962, that fact will be assumed as established despite the contrary testimony and Alfinito's subsequent attempt to withdraw the stipulation.

The evidence fully sustains the finding that the "addenda" was not executed until approximately seven days thereafter. Both Alfinito and Goldhammer so testified.

The investors insist that the date of the agreement and not the date of the addenda controls the computation of the year's

time because the paragraph in which it is contained relates back to terms which are contained in the original agreement. On the other hand, the developers point out that the language in the "addenda" refers to "the date of this agreement"; that it is therefore open to the interpretation that it means the date of execution of the "addenda"; and that since it was prepared by the investors' attorney it should be construed against them. Although the developers' interpretation may be sustained as reasonable, it is not necessary to rest on this conclusion.

The court further found: "That said tender so made by plaintiffs to the joint venture was rejected by defendants on the ground that it was too late; that defendants were neither prejudiced nor damaged by the fact that plaintiffs made said tender on April 23, 1962; that there is no provision in the agreement of April 21, 1961, or in the addenda thereto, making time of the essence; that defendants made no objection to the amount, or the sufficiency, or the manner of said tender; that even if said tender had been due on April 20, 1962, as contended by defendants, the delay was excusable under the circumstances."

The evidence reflects that on Friday, April 20, 1962 at 10:50 p.m. Sater telephoned Alfinito and told him to put up his money in Sater's office by Monday morning, and not to tell Goldhammer.[7] The next morning Alfinito mailed a check for $37,500 by special delivery, registered, to the title company with instructions. On advice of the attorney then acting for the joint venture he advised Goldhammer. The latter caused a telegram to be sent to the investors advising them that the developers were prepared to deposit the money on the ensuing Monday and asking them to indicate where it should be paid. The following Monday Goldhammer deposited $37,500 with the title company. On that Monday the investors sent the developers a telegram which read: "Joint venture agreement dated April 21 1961 pertaining to your participating interest in Alviso property was broken by you by nonpayment on due date."

The investors insist that under the authorities set forth

---

[7]Sater could not recall if he had telephoned Alfinito in April prior to the evening of April 21, 1962 when he telephoned him to request him to collect some rent from a delinquent tenant, and asked him if he had put up his share. Sater was unable to recall Alfinito's reply. He further told Alfinito that he and Goldhammer were out of the venture as far as the investors were concerned.

above in relation to option agreements there could be no extension of time for the exercise of the option. This overlooks the nature of the agreement. It is more than an option to purchase real property. At the outset the developers by virtue of their deposit had an equitable interest in the property. This right was exercised for the benefit of the joint venture by the conveyance to the investors. Although the developers secured a return of their deposit, that fact does not detract from their status as joint venturers until their rights were forfeited under the terms of the joint venture agreement.

In the absence of the provisions for the release, relinquishment and quitclaim of the interests of the developers (see fn. 6, *supra*), the investors would continue to hold the property as constructive trustees for the joint venture. In *Epstein* v. *Stahl* (1959) 176 Cal.App.2d 53 [1 Cal.Rptr. 143], the court quotes with approval the following language found in 30 American Jurisprudence (1958) Joint Adventures, sections 9, 15 and 16, pages 945, 950 and 951: "Although it has been contended that the property with which the parties to a joint adventure are to operate must be acquired after the relationship has come into existence, it seems clear that it is immaterial whether the property involved was individually owned before the joint venture was entered upon or was afterward acquired, so long as it was contributed and devoted to the uses and purposes of the enterprise. . . . A joint adventure may be formed for the purpose of a single transaction in real estate. A joint adventure exists where two or more persons enter into a contract for the purchase and resale of land, agreeing to divide the profits, although the purchase is to be financed by one of the persons only, the others furnishing no money, but agreeing that the former shall be first repaid money advanced before any division of profits shall be made. . . . Similarly, it has been held that a joint adventure exists under an agreement for the equal sharing of profits by one who furnishes the money for the purchase of certain realty and by another who furnishes his time, skill, and supervision in the purchase, the clearing of title, and the development of the property. Likewise, an agreement between the owner of lots and a building contractor, for the construction of houses on the lots and a division of the profits from the sale of the houses, has been held to give rise to the relationship of joint adventurers, rather than that of master and servant or of independent contractor, where it discloses an intent that both parties shall contribute to the enterprise, exercise joint control over it, and be accountable to each

other for their acts in carrying it out." (176 Cal.App.2d at p. 58; see also *Koyer* v. *Willmon* (1907) 150 Cal. 785, 786-788 [90 P. 135]; *Jaffe* v. *Heffner* (1959) 173 Cal.App.2d 512, 516 [343 P.2d 374]; *Lindner* v. *Friednash* (1958) 160 Cal.App.2d 511 [325 P.2d 612].) ▇▇▇ Despite the failure of the joint venture the defaulting party is generally entitled to an accounting of his property interests. (*Hill* v. *Hearron* (1952) 113 Cal.App.2d 763, 767 [249 P.2d 54]; *Martin* v. *Burris* (1922) 57 Cal.App. 739, 746-748 [208 P. 174].)

▇▇▇ Upon the execution of the agreement and the "addenda" the four parties became involved in a joint venture which would terminate at the end of the year unless construction was commenced or unless the developers furnished their contribution. The investors had put up the down payment and on any dissolution of the joint venture would have been entitled to repayment of that sum under general principles of law. (See Corp. Code, § 15018, subds. (a) and (b).) Although there was no express promise as distinguished from an option on the part of developers to pay up an equal amount, there was an agreement implied by law to reimburse the investors for one-half of what had been paid out. To secure this right to repayment and to protect the interests of the investors if the developers' rights terminated, title was taken in the investors' names.

The situation is somewhat analogous to an equitable mortgage where E pays the amount necessary to acquire property in which R is interested, and title is taken in E's name. R is permitted to show that he was obligated to pay E and on making payment can secure a conveyance. (See *Greene* v. *Colburn* (1958) 160 Cal.App.2d 355, 358 [325 P.2d 148]; *Talbot* v. *Gadia* (1954) 123 Cal.App.2d 712, 718 [267 P.2d 436]; *Wilcox* v. *Salomone* (1953) 118 Cal.App.2d 704, 710 [258 P.2d 845].) Under such circumstances "The grantee thus holds a double relationship to the purchaser, being trustee of the legal title and mortgagee for the money advanced for its purchase." (*Talbot* v. *Gadia, supra,* 123 Cal.App.2d at p. 718.) So here, by virtue of the joint venture agreement, the investors hold title to one-half for their own account and one-half as trustees and mortgagees for the developers. By the terms of the agreement the rights of the developers to further participate were subject to termination at the end of one year, but that does not necessarily imply that they did not have the rights, and were not subject to the liabilities of joint venturers during the interim period.

The foregoing principles of law indicate that the special provisions of the agreement under consideration herein should be considered as conditions subsequent, divesting the developers of the right they would otherwise have to share in the property upon payment of half the cost either directly, or with the proceeds of the Alice property.

The conclusion that the payment of the specific contribution was not a condition precedent to creation of the joint venture is strengthened by reference to the terms of the agreement. It recites that the parties, "do hereby agree to form, and *do hereby form*, a joint venture." (Italics added.) After the provisions for contribution, and for termination of the developers' rights there follows: "In the event third party or fourth party should die prior to the time that their contribution to this joint venture equals that of first party and second party, then it is agreed that in the event the Estate of third party or fourth party produces a bona fide offer to buy the above described real property, then first party and second party shall have the option of either retaining the above described real property, and paying to the estate of the deceased party one-fourth of the net profit, or selling the property." The developers' covenants to apply themselves to the business of the joint venture also contemplate, as the investors stress, an immediate obligation.

From the foregoing it is concluded that the developers' rights under the agreement were more than a mere option. They were entitled to protection from forfeiture and the court properly found that even though the time expired prior to their deposit, they could be relieved of any default without prejudice to the investors. ▆▆ Section 3275 of the Civil Code provides: "Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty." The acceptance of Alfinito's testimony that Sater told him to put up the money by Monday (April 23d) would justify the application of this section. (See *Gonzalez* v. *Hirose* (1948) 33 Cal.2d 213, 216-217 [200 P.2d 793].) ▆▆ Furthermore, the general policy against forfeiture applies to a joint venture agreement. (See *Hill* v. *Hearron, supra,* 113 Cal.App.2d 763, 766-767.)

▆▆ Finally, since the provision is not a bare option, but one for the termination of the developers' rights, it is

governed by the following: "It is beyond cavil that plaintiffs herein who are seeking specific performance have tendered in full the entire balance due on the purchase price. Defendant contends that since the time fixed for such performance in the escrow instructions was prior to March 1, 1952, the arrival of plaintiffs' funds on March 3, 1952, was too late and thus defeats their right to specific performance. This argument is untenable, since nowhere is it clearly manifest that deposit of the money by plaintiffs prior to March 1, 1952, is the essence of the contract. Professor Pomeroy, in his treatise on Specific Performance, states 'the prescribing a day at or before which, or a period within which, an act must be done, even with a stipulation that it shall be done at or before the day named , . . . does not render the time essential with respect to such an act.' (§ 392, p. 835.) The general rule in equity is that time is not of the essence unless it has been made so by its express terms or is necessarily so from the nature of the contract. (Williston on Contracts, vol. III (rev. ed. 1936), p. 2385.) In *Miller* v. *Cox,* 96 Cal. 339, [31 P. 161], it is stated that the intent to make a particular date, or time, 'the essence of the contract must be clearly, unequivocally and unmistakably shown by an express declaration. . . . In order to render time thus essential, it must be clearly and expressly stipulated that it shall be so; it is not enough that a time is mentioned during which or before which something shall be done [citations].' (P. 345.) This language has in substance been reiterated in *Walsh* v. *Walsh,* 42 Cal.App.2d 287, 292 [108 P.2d 765]; *Cushing* v. *Levi,* 117 Cal.App. 94, 104 [3 P.2d 958]; *Flagler* v. *Kroonen,* 61 Cal.App. 359, 366-367 [214 P. 1006] and is in consonance with the modern view that valuable contractual rights should not be surrendered or forfeitures suffered by a slight delay in performance unless such intention clearly appears from the contract or where specific enforcement will work injustice after a delayed tender. (*Cockrill* v. *Boas,* 213 Cal. 490 [2 P.2d 774]; *Mathews* v. *Davis,* 102 Cal. 202 [36 P. 358].)" (*Katemis* v. *Westerlind* (1953) 120 Cal.App.2d 537 at p. 543 [261 P.2d 553]; and see *Lifton* v. *Harshman* (1947) 80 Cal.App.2d 422, 433-434 [182 P.2d 222].)

The trial court further found: "That on Saturday, April 20, 1962, defendants orally repudiated their obligation and promise to convey an undivided one-fourth interest in the Alviso property to plaintiffs . . ., and continuously thereafter defendants have repudiated said obligation and promise and have failed and refused to recognize their said obligation and promise and have failed and refused to convey to said plain-

tiffs their respective one-fourth interest in said Alviso property.''

The developers make no attempt to justify the April 20th date. Since Saturday was April 21, 1962, the court's finding must refer to the telephone conversation on that day to which Sater testified (see fn. 7, *supra*). Since, under the investors' theory, the termination of the developers' rights under the provisions of the ''addenda'' was to ''be effective at the end of one year after'' April 21, 1961, that year would not expire until midnight April 21, 1962. (Gov. Code, § 6800; Civ. Code, § 10; Code Civ. Proc., § 12; and see regarding Saturday, Gov. Code, §§ 6702, 6704, 6706 and 6707; Civ. Code, §§ 9 and 11; and Code Civ. Proc., §§ 10, 12a, 12b and 13.)

 The repudiation was made during the period in which the agreement could have been performed, despite the investors' mistaken belief that the period expired on April 20th. Such a repudiation excuses the necessity for performance by the other party. (Civ. Code, § 1440; *Gross* v. *Raeburn* (1963) 219 Cal.App.2d 792, 807 [33 Cal.Rptr. 432]; *Singh* v. *Burkhart* (1963) 218 Cal.App.2d 285, 292-293 [32 Cal.Rptr. 639]; and see *Beverage* v *Canton Placer Mining Co.* (1955) 43 Cal. 2d 769, 777 [278 P.2d 694].)

Investors cannot avoid their obligation because of the time at which the contribution was tendered.

*The plaintiffs' tenders were for an adequate amount*

 The investors point to the provisions of the ''addenda'' to the April agreement which indicate that ''the parties shall contribute equally any funds required. . . .'' As a result of the pretrial conference investors indicated that they had advanced, in addition to the $75,000, $17,797.56 for taxes, insurance, spraying trees and insurance. Pollock testified that the total contribution of the investors prior to April 21, 1962 was $100,000.

The court, however, found: ''That the said joint venture agreement required defendants to contribute $75,000.00, which defendants did; that by said agreement, defendants agreed to convey to plaintiffs an undivided one-fourth (¼) interest in said Alviso property at such time as the contribution of these plaintiffs and the Goldhammers to the joint venture equalled the $75,000.00 contribution of defendants.''

This finding is sustained by the provisions of the agreement and the facts. The agreement recites: ''title to the above described property shall remain in the name of [investors] until

such time as the contribution of [developers] equals *the contribution made herein* by [investors]" (see fn. 5; italics added). The recitals of the agreement refer to the investors' desire to contribute the sum of $75,000; that sum is noted as the amount the investors agree to "immediately contribute" and again it is recognized as the approximate sum which will be needed within one year after the date title is acquired.

There is no express provision in the agreement or "addenda" concerning the payment of taxes, interest, or other maintenance charges. The addenda does provide: "any funds available from the permanent financing of Alice Avenue, or other funds derived from any other ventures in which the parties participate jointly, shall be used for such purpose [to supply "funds required in connection with additional ventures"] prior to requiring capital contributions from the parties."

The record reflects that the investors received the proceeds of refinancing the Alice property and the rents therefrom. According to an income tax return prepared for the Alice property joint venture in 1962 the net cash rentals before depreciation were $21,504.09. The refinancing of the Alice property yielded about $108,000. From these and other sums the investors, without consulting the developers, distributed to themselves in equal shares the sum of $139,670.16. Under these circumstances and the provisions of the agreement the burden should be on the investors to account to the developers before demanding an additional contribution. The court properly so implied in its findings.[8]

Furthermore, any objections to the amount tendered were, under principles hereinafter discussed, waived by the failure to object on that score.

*The plaintiffs' tenders were made in*
*a proper manner*

The investors examined the letter which was received by the title company from Alfinito at 9 a.m. on April 23, 1962, and the instructions executed by Goldhammer on the same day and pose additional objections to the tender.

Each of the instruments refer to a "joint venture agreement dated April 21, 1961," but no copy of the agree-

---

[8]The court found: "That defendants have not at any time informed plaintiffs or the Court of the true nature and amount of all monies over and above the sum of $75,000.00 expended by defendants for or on behalf of the joint venture, or contributed by defendants to said joint venture."

ment was deposited with the title company. The investors claim that the instructions were therefore incomplete in that they did not designate to whom the money was to be paid. The title company representative testified that he was prepared to pay the money over to a grantor who had a vested interest in the property and would convey the interests demanded by the depositing developers. Until such time as the investors tendered a deed and were refused payment they cannot object on this score. They were duly notified of the deposit by the title company.

The investors' objections that the instructions failed to require the title company to ascertain if there were further contributions due is covered by what has been said above.

The fact that Alfinito requested to be recognized as a participant in the share which would terminate if Goldhammer did not exercise his rights can be of no consequence in view of the fact that the latter did exercise his rights and the investors were so notified.

Alfinito's expression that he desired and intended to exercise his rights under the joint venture agreement was no more than that to which he was entitled.

Goldhammer's request for the deed in his name alone, despite the provisions of the addenda which expressly make his wife a co-owner, should not defeat his tender in the absence of a tender of a deed and a request for her authorization by the investors.

Investors correctly point out that under the terms of the agreement in question, mere advice that the developers intended to exercise their rights would be insufficient. (*Callisch* v. *Farnham, supra,* 83 Cal.App.2d 427, 430.) They seek to avoid the fact that the advice was backed up by a deposit of the funds which were required to be contributed by asserting that the agreement called for an unconditional deposit. In *Bourdieu* v. *Baker, supra,* 6 Cal.App.2d 150, the court held that where the agreement called for an unconditional payment by a date certain, with the right in the grantor to have four months within which to deliver a deed, instructions which conditioned the payment upon delivery of a deed "entirely changed the terms of the contract." It concluded, "the evidence entirely fails to show any tender or sufficient offer to perform." (6 Cal.App.2d at p. 159.)

This contention is answered by *Hunt* v. *Mahoney* (1947) 82 Cal.App.2d 540 [187 P.2d 43], wherein the court distinguished the foregoing case by noting: "There, there was no require-

ment that the title be perfect at the time of the $3,000 payment. It merely had to be perfect at the time of the final payment. Here, there was no intermediate payment to be made. The $14,000 was a final payment and the title had to be marketable when that payment was made." (82 Cal.App.2d at p. 549.) In general in a contract for the sale of an interest in real estate the delivery of the deed and the payment of the purchase price are dependent and concurrent conditions. (*King* v. *Stanley* (1948) 32 Cal.2d 584, 590 [197 P.2d 321]; *Greenstone* v. *Claretian Theological Seminary* (1959) 173 Cal.App.2d 21, 33 [343 P.2d 161]; and see Civ. Code, § 1437.)

 Investors contend that the deposits were not unconditional tenders, and that in fact Goldhammer subsequently withdrew his money from the title company. "Defendants seem to contend that in order to bring this suit, the tender of April 9th, if made, must be kept good by the deposit of the $14,000 in the bank for the account of defendants, and cites section 1500 of the Civil Code in support of this contention. But as said in *Marshall* v. *Hilton*, 209 Cal. 531, at page 534 [289 P. 165] : 'This section has no application to a tender made in a case of this kind. It applies in cases where the object and purpose of the tender is to extinguish an obligation. Here no claim is made that the tender proven extinguishes the obligation of the respondents to pay to the appellant the amount due her under the agreement of sale, but was a preliminary step to be taken before an action could be instituted by the respondents against the appellant to specifically perform the contract. In such a case "the law does not require the purchaser to keep the tender good or deposit the money in the vendor's name and thus place himself at the vendor's mercy, since the decree, if granted, will require the plaintiff to pay the purchase money before receiving the deed." (23 Cal.Jur. 459.)' " (*Hunt* v. *Mahoney, supra,* 82 Cal.App.2d 540, 547.)

 The *Hunt* case also establishes that the investors' failure to raise any objections, other than to the timeliness of the tender, precludes the assertion of such objections herein. "A failure to object to the form of the tender constituted a waiver. 'All objections to the mode of an offer of performance, which the creditor has an opportunity to state at the time to the person making the offer, and which could be then obviated by him, are waived by the creditor, if not then stated.' ( Civ. Code, § 1501.) 'The person to whom a tender is made must, at the time, specify any objection he may have to the money,

instrument, or property, or he must be deemed to have waived it; and if the objection be to the amount of money, the terms of the instrument, or the amount or kind of property, he must specify the amount, terms, or kind which he requires, or be precluded from objecting afterwards.' (Code Civ. Proc., § 2076.) 'Objections held to be waived by the creditor when not stated at the time of the making of the tender include objections as to amount, the person making it, conditions accompanying it, and the medium of exchange in which the offer is made.' (24 Cal.Jur., p. 531.) 'Further, if, because of a generally recognized business usage or because of the course of dealings between the parties, the obligor has reason to believe that tender in a medium other than that prescribed by law will be acceptable and the obligee refuses it, insisting on legal tender, the obligee must give the obligor a reasonable time in which to make a valid tender. . . . The more technical the objection to the tender, the more reasonable will be the inference from slight evidence that the objection is waived . . . .' (Williston on Contracts, rev. ed., vol. 6, pp. 5157, 5159.)'' (82 Cal.App.2d at pp. 546-547; and see *Ray Thomas, Inc.* v. *Cowan* (1929) 99 Cal.App. 140, 146 [277 P. 1086].)

The investors' objections to the developers' tender of their contributions have no substance. The findings of fact and conclusions of law on that phase of the case are sustained by the record. Inquiry is next directed to the investors' contentions regarding failure of the developers to perform other terms of the agreement.

### *The construction of improvements was not an express condition precedent to the right to a conveyance*

The trial court found that construction of improvements was not commenced on the Alviso property. The investors apparently interpret the provisions of the agreement and the addenda which terminate the rights of the developers (see fn. 6, *supra*) as requiring termination of those rights if no construction was commenced on the Alviso property within one year, regardless of whether the developers contributed the requisite capital. A reading of the clauses contained in the agreement and the ''addenda'' demonstrates that there had to be a concurrence of failure to commence construction and failure to contribute before the rights of the developers would terminate.

This conclusion is fortified by the fact that in the ''addenda'' the parties deleted the clause which would have terminated the joint venture upon the failure to commence construction (see fn. 3, *supra*). Investors claim that this clause was deleted

so it would not affect the rights and obligations of the investors *inter se* even though the agreement terminated as to the developers. This explanation fails to take into consideration the situation which conceivably could have arisen if developers had made their contribution before the expiration of the year. The agreement did not require them to wait the full period. Their contribution, once made, could not have been forfeited because there was a subsequent failure to commence construction.

### *The failure to develop the property does not bar the right to specific performance*

In the second addenda to the Alice property agreement the developers ''agree to devote all of their efforts and time in the development of these [indicating Alice and Alviso] properties.'' This provision is incorporated by reference in the original Alviso property agreement which further recites: ''Third and fourth party agree and have represented to first and second party that they intend to devote a substantial amount of their time and energy in developing the above described real property for the purpose intended. Immediately after the execution of this agreement third and fourth parties agree to devote a substantial amount of their time and energy in developing the above described property.'' The ''addenda'' to the latter agreement contains the commitment hereinabove set forth (see fn. 4, *supra*).

The investors contend that since the property was not developed, the developers cannot secure specific performance because (1) the investors' assent was obtained by a promise of the developers which has not been substantially fulfilled (Civ. Code, § 3391, subd. 3), and (2) the developers have not fully and fairly performed all the conditions precedent on their part to the obligation of the investors (Civ. Code, § 3392).

The foregoing confuses the issues which are involved in the question litigated—the rights of the joint venturers among themselves to have the property stand in their respective names pursuant to the terms of the joint venture agreement—and the questions of the inducement to enter the joint venture agreement and whether or not there has been a breach of that agreement. The question of the status of the joint venture agreement is hereinafter discussed. ▉ Suffice it to say that although the breach of the agreement to render services may provide grounds to terminate the joint venture agree-

ment, it does not necessarily constitute a condition precedent to the existence of other rights and obligations under the agreement which exist until the agreement has been terminated by agreement or legal action.

The issue of the developers' performance of the agreement to develop does not relate to the isolated covenant of the investors to convey, but to the question of the existence of the entire joint venture agreement itself. The investors are not attempting to rescind the agreement for fraud or failure of consideration so as to recover the money which they have advanced. They desire to retain the fruits of the agreement—an interest in real property which apparently has a worth considerably in excess of the purchase price—without recognizing the rights of their co-venturers who brought to the joint venture the right to purchase this property. The investors' contention that the agreement was merely an agreement to enter into a joint venture if certain conditions were performed has been rejected for reasons hereinabove set forth. The question, therefore, turns upon whether or not there has been such a breach of the agreement by the developers as to amount to a repudiation of the joint venture agreement.

The trial court found: "That following the execution of said agreement and addenda, [each of the developers] made reasonable efforts to develop said Alviso property, and devoted a substantial amount of time and energy to developing said property; that as a result of said efforts, a rendering was prepared from which improvements could be erected upon said Alviso property in accordance with standard commercial construction practices; that construction of said improvements was not commenced, but was delayed and held up at the specific instance and request of [investors] for tax reasons beneficial to [investors], and until tenants suitable to [investors] could be found for said proposed improvements, and because of attempts by [investors] to buy out the interests of [developer] Harry Goldhammer and vice versa, because of friction between [investors] and said developer(s)."

In the Alfinitos' case the findings further recite: "That [developers] did not violate the joint venture agreement . . . ." In the Goldhammers' case, the comparable recital is: "That [developers] substantially performed the joint venture agreement . . . ."

In each case the court set forth as a conclusion of law: "That plaintiffs . . . have fully performed the provisions of the agreement of April 21, 1961, and the addenda thereto,

. . .''; and ''That [investors] by their conduct prevented and excused performance by [developers] of the provision of the agreement of April 21, 1961, and the addenda thereto, whereby construction was to be commenced on said Alviso property within one year from the date of the undated addenda to the April 21, 1961, agreement.''

The investors attack the sufficiency of the foregoing findings insofar as they purport to reflect that the developers devoted ''a substantial amount of their time and energy in connection with the development of all joint ventures on a basis consistent with sound business judgment.'' (See fn. 4, *supra*.) The findings reflect that no construction was commenced. Alfinito admitted that he stopped doing anything with relation to the development of the Alviso property in November 1961. Goldhammer testified that from April to November 1961 he spent most of his time on the joint venture property; and that thereafter he placed a tenant on the Alice property and arranged for the refinancing and new loan on that property.

From the foregoing it is clear that the developers did not continue to perform at all times up to the time they tendered their contribution. There is nothing to show, however, that the investors considered this a breach justifying abrogation of the original agreement. Sater allegedly invited Alfinito to put up his contribution in April 1962, and in the investors' joint objection to the allegedly tardy tender nothing indicated that failure to commence construction or lack of efforts to develop the property had defeated the right to contribute.

In the case of each developer the first part of the specific finding suggests that there was substantial performance. The court expressly so found in the case of Goldhammer, and the finding that Alfinito did not violate the joint venture agreement permits the inference that he was entitled to credit for such performance as was actually rendered.

The evidence reflects that the ''rendering'' which the investors refer to as ''a pretty picture'' was produced by an architect who was also engaged to prepare and did prepare a layout and master plan. Both Alfinito and Goldhammer testified to activities concerning the premises which consisted of rezoning, settlement of the condemnation action, and numerous conferences with an architect, a civil engineer, a contractor, realtors, prospective tenants, and their associates.

The findings, express and implied in regard to the developers' activities, are sustained by the evidence.

In view of the fact that these activities concededly ceased by

the end of 1961, the crucial question is whether the developers thereby breached, abrogated or abandoned the joint venture agreement, or whether the findings and conclusions of the trial court that further performance was prevented by the investors and was thereby excused are sustained by the evidence.

In each of the complaints it is alleged that ''plaintiffs have performed all of the obligations, conditions and promises on their part to be performed pursuant to said agreement.'' Investors contend that the foregoing pleading precludes a showing that performance was excused. ''The rule is well understood that a recovery on proof of excuse for nonperformance cannot be had on an allegation of full performance [citations].'' (*Kirk* v. *Culley* (1927) 202 Cal. 501, 506 [261 P. 994]; accord: *Martin* v. *Chernabaeff* (1954) 124 Cal.App.2d 648, 655 [269 P.2d 25]; *Barnhart* v. *Blackburn* (1934) 137 Cal.App. 240, 242 [30 P.2d 424].)

These authorities are not applicable to the issues as presented in this case. In the first place, as noted above, the covenant to develop is a part of the overall joint venture agreement and not necessarily a condition precedent to an express right to secure a conveyance upon making the requisite contribution.

Secondly, the issues of prevention and excuse of performance were raised in the pretrial proceedings. The Goldhammers' suit was only filed a few days before the date originally assigned for trial of the Alfinitos' action. Thereafter a pretrial conference was held at which Alfinito was represented by his counsel and the cases were consolidated for trial. The order made as a result of that conference expressly states, among the contentions of the Goldhammers: ''that plaintiffs Goldhammer . . . were prepared and ready to go ahead and devote their time and energy toward the improvement of the property; that plaintiff Harry Goldhammer was a developer and was to formulate plans and layout to develop the acreage and then to find eventual tenants; that he attempted to do this, but was hindered by the defendants who refused to go along with any of his ideas; . . . .'' The order further recites: ''Plaintiffs Goldhammer contend that there was a repudiation in effect of this agreement by the uncooperativeness of the defendants in refusing to act and in every way blocking said plaintiffs from going ahead with the agreement; that, in not being permitted to do so and having time and energy on their hands, plaintiffs did go into other busi-

nesses.''[9] Alfinito never expressly presented the issue in this fashion, but the pretrial order in his case makes it clear that the question of the performance to be rendered by Alfinito was in issue.[10]

In *Kirk* the action was for attorney's fees, in one count upon an express contract and in the second count in *quantum meruit*. The evidence and findings reflected that the attorney had been discharged and was thereby prevented from performing the terms of the contract. The services were the consideration for which the payment was to be made under the contract. Since they were not rendered the contract price could not be recovered. The court pointed out that the attorney might have an action for wrongful discharge in which the measure of damages might in some cases be the contract price (202 Cal. at p. 506). It went on to award the plaintiff recovery on the count in *quantum meruit* (*id.*, pp. 507-510). Here, as has been pointed out, the services were not the consideration for the conveyance, but at most a condition going to the existence of the agreement.

In *Barnhart* the court recognizes the rule. Its conclusion, however, was predicated upon "the fundamental fallacy . . . that respondents treat the agreement between the parties as an agreement of sale rather than as an agreement of exchange." (137 Cal.App. at p. 243.) It also noted that "the pleadings, proof and findings were *all* insufficient to sustain the judgment . . . as a judgment for damages." (*Id.*, p. 244; italics added.)

In *Martin* the complaint and the findings were predicated upon the theory that plaintiff fully performed his duty. (124 Cal.App.2d at p. 654.) The court, after recognizing the rule upon which the investors rely herein, pointed out that the evidence presented the issues of whether performance was pre-

[9] A subsequent reference in the pretrial conference order to a contention that certain provisions of the contract had been orally waived, and granting both Alfinito and Goldhammer time within which to amplify the contention—a privilege which was not exercised—does not appear to apply to the above issue of prevention of performance.

[10] The original pretrial conference order recites: "It is defendants' contention that . . . the plaintiffs violated the terms of the agreement in that although they agreed to devote their full time to the joint venture, they entered into other agreements which required their full time and attention." As amended, at the request of defendants, it further provided: "It is the position of defendants that although this agreement was designated a joint venture agreement, it did not become such until plaintiffs and Goldhammer made the required contribution and other performance required by defendants as called for under the agreement within the time specified in the manner specified, . . .."

vented or excused (*id.*, p. 655), and concluded: "Since the plaintiff pleaded full performance of the agreement and since the action was tried, over strenuous objections of defendants, upon the theory that plaintiff was prevented from performing his agreement by reason of nonperformance of defendants and by reason of their fraud, on a retrial, the pleadings may be amended accordingly and findings entered in accordance with the pleadings and evidence produced." (*Id.*, p. 656.) This is what the trial court has in effect already done in connection with the Alfinitos' case. No procedural error is apparent.

Finally, investors question the sufficiency of the evidence to sustain the findings that construction of the improvements was delayed and held up for the reasons set forth in the findings of the court, and to sustain the conclusions of law, which are apparently predicated thereon, to the effect that the investors prevented performance by the developers. They contend that there is no evidence to sustain a finding of an excuse relieving Alfinito of the obligation to perform; and that Goldhammer's own truculence should not relieve him of the duty of going forward with development in the manner in which the investors, with the approval of Alfinito, were insisting that it be done. Although the evidence may be susceptible of inferences favorable to the investors in those particulars, it is equally supportive of the court's findings and conclusions.

Alfinito did testify that neither of the investors had advised him that they wanted to prevent the developers from developing the property; and that he did not know of anything that either of the investors might have done to prevent the developers from so proceeding, but the difficulties hereinafter narrated unquestionably existed.

Goldhammer testified that Pollock told him in October 1961 that the investors did not want any development at that time unless he got a "Triple A tenant" for the whole thing; that they wanted to keep it for tax-wise purposes; and did not want to put up any building at that time; that no blueprints were prepared from the layout and sketch because everything that Goldhammer tried to do they did not want to do; and because the investors said they wanted to hold the property for tax purposes.[11]

The record reflects that Goldhammer's method of operation

---

[11]Pollock denied that he ever informed the developers that he or Sater did not want the property developed by reason of some benefit that could be received for tax purposes. He asserted that he told Goldhammer that the only tax advantage was in the depreciation allowance obtained by constructing a building and leasing it.

was to attract possible tenants by putting up a building; that in April or May of 1961 his proposal to build on a portion of the Alviso property was rejected; that in August he was very excited about putting a building up and in the fall of 1961 negotiated with a newly formed electronics corporation for the purpose of leasing a building to be constructed on the Alviso property; that Alfinito and Sater did not want to develop right away and especially not haphazardly; that Sater wanted to wait until they had a good tenant, Triple A tenant, and they had time to properly plan the use of the property; and that the proposed tenant was turned down because of lack of financial rating.

On October 2, 1961, Goldhammer had an attorney write the other three associates a letter in which he complained of their alleged rejection of a tenant for the Alice property, the alleged rejection of an alleged purchase offer for that property, and the alleged refusal to build on the Alviso property. On October 5th Pollock replied, ''We have never been against building on Alviso Road—AFTER we sell Alice and make a decision about Terra Bella. I am not going to build for any second rate tenant on Alviso, nor am I going to agree just to build a small building. All of us, including Mr. Goldhammer, agreed on a master plan for a triple 'A' rated tenant for a substantial portion of the ground.'' On October 10th an attorney engaged to represent the investors and Alfinito replied: ''A majority of the joint venturers are not desirous of developing the 28 acres on Mountain View-Alviso Road on a piecemeal basis at this time. They feel plans should be formulated for an orderly development of said acreage and as of this date, no such plans have been proposed by any party.''

Thereafter there were negotiations to purchase Goldhammers' interest. A written proposal dated December 22, 1961 was prepared, but no sale was ever consummated. In the course of these negotiations Pollock attempted to work out a new arrangement with Alfinito, but was turned down.

The record reflects that Goldhammer could not deal with Sater because they were fighting all the time; that he was also arguing with Alfinito; and that on and off during June, July and August the developers were not speaking to one another, and the contractor on Alice Street had difficulty getting cooperation from Alfinito. Alfinito also complained to the investors about the manner in which Goldhammer was conducting their business.

From this complex mass of testimony the trial court was

justified in making the findings and conclusions it did. Since the developers were excused from further performance, their alleged failure was no bar to their right to secure specific performance. (*Ambrose* v. *Alioto* (1944) 65 Cal.App.2d 362, 369 [150 P.2d 502]; and see *Furtinata* v. *Butterfield* (1910) 14 Cal.App. 25 [110 P. 962].)

### *The consideration was adequate*

The investors claim that it was error to grant specific performance because the consideration for the agreement was inadequate and it was not just and reasonable to enforce the contract against them. (See Civ. Code, § 3391, subds. 1 and 2.) They also claim error in failure of the court to find more specifically on these points.

This contention rests on the premise that developers for an investment of $75,000 are given a one-half interest in land which had a net cost of $185,000, which has been the subject of further expense of from $17,000 to $25,000, and which concededly is worth a great deal more than the purchase price. The judgments do no such thing. They provide for payment of $37,500 by each of the developers to the joint venture in return for a good and sufficient deed to an undivided one-fourth interest in the property. It is true that the agreement provided that "A policy of title insurance shall be issued insuring title as above stated free and clear of encumbrances except current taxes, a lien but not delinquent," and that the balance of the purchase price was in April 1962 a lien against the property, and if subsequently paid should be a charge to be considered in the joint venture. The judgment, however, does not abrogate, but rather ratifies the existence of the joint venture agreement, and each of the parties is entitled to a full accounting under its terms. From all that appears the balance of the purchase price has been paid off from the proceeds of the condemnation and the amounts received by the investors for the account of the joint venture from the Alice property. The judgment does no more than equalize the contributions of the parties, and the property still stands as an asset of the joint venture.

The court found, "That the agreement of April 21, 1961, and the addenda thereto, was just and reasonable, and the consideration therefor was adequate." These findings were sufficient. (*Peterson* v. *Ellebrecht* (1962) 205 Cal.App.2d 718, 721 [23 Cal.Rptr. 349].) More detailed findings would avail the investors naught, as they would disclose that the parties by

the conveyance and payment were left with equal rights and obligations under the joint venture agreement.

### There is no lack of mutuality of remedy

The investors contend that specific performance should have been denied because the investors could not have specifically enforced the developers' agreement to develop the property. (See Civ. Code, § 3390, subd. 1.) This argument presupposes that the court is attempting to specifically enforce the entire joint venture agreement. Neither the relief sought nor the judgment rendered contemplated such action by the court. The developers sought specific performance of the agreement to convey. It was not enforcible until they deposited their contribution, but thereupon it was enforcible by either party in the event of the default or attempted withdrawal by the other. (*Adams* v. *Williams Resorts, Inc.*(1962) 210 Cal.App.2d 456, 462 [26 Cal.Rptr. 656].) The investors' reliance upon *Rautenberg* v. *Westland* (1964) 227 Cal.App.2d 566 [38 Cal.Rptr. 797] is misplaced. In that case there was an actual termination by mutual consent of the employment which would have given rise to the plaintiffs' right to purchase stock, and the option to purchase fell with it. The trial court found therein that there was no substantial performance. (Cf. *Ambrose* v. *Alioto, supra,* 65 Cal.App.2d 362, 369-370.) Herein the joint venture agreement is still in existence.

### There was no ambiguity or lack of certainty in the portion of the agreement which was enforced

''An agreement, the terms of which are not sufficiently certain to make the precise act which is to be done clearly ascertainable'' cannot be specifically enforced. (Civ. Code, § 3390, subd. 5 [formerly (pre-Stats. 1961, ch. 461, § 5, p. 1551), subd. 6]; and see *Burr & Ladd, Inc.* v. *Marlett* (1964) 230 Cal.App. 2d 468, 473-474 [41 Cal.Rptr. 130].) Investors' reliance upon this principle is again predicated upon the false hypothesis that the court has been requested to and is in fact attempting to enforce the entire joint venture agreement. Such, as has been demonstrated, is not the case.

### There was no violation of the agreement to not engage in other real estate or construction projects

By the addenda each of the developers so agreed (fn. 4, *supra*). The record reflects that Alfinito was a party to a lease dated January 25, 1962 in the Hillsdale Farmers Market whereby he undertook that he himself would devote substan-

tially his entire business time to the business of his restaurant and not engage in any other business or employment. The testimony reflects that he was so engaged in business under a similar lease at the time the joint venture agreement was executed, and that he did not engage in any real estate or construction projects, other than the Alice and Alviso property joint ventures until August 1962 after the investors had refused to convey.

The trial court properly observed that the existence of the agreement did not indicate whether he had performed it. In any event, it is clear from the record that all of the contracting parties knew that Alfinito was in the restaurant business and expected his participation in the activities in the joint venture to be subordinate to his necessary attention to that business.

In the case of Goldhammer, the court made an express finding that he "did not engage in other real estate transactions contrary to and in violation of the spirit of said agreement and the purposes thereof." In his pretrial contentions he admitted that he did go into other businesses when blocked by the investors' refusal to build. He testified that in November 1961 his associates told him he was through and out, and that he started devoting energy to other projects; that he subsequently rented some of the Alice property and got the loan on those premises; that in March 1962 he sold a building he owned and started to develop another project with the purchaser; that subsequently he secured a Triple A tenant for the new project.

The covenant in question is qualified by the clause "so long as they are jointly participating with [investors] in any venture" (see fn. 4, *supra*). The activities in question all occurred after the events to which the trial court looked in excusing further performance by the developers. The evidence sustains the findings of the court that there was no breach.

*Specific performance was not barred by the developers' receipt of joint venture funds*

"The failure of one of the several joint adventurers, in an enterprise looking to the purchase of property, to share with his coadventurers any secret advantage given by their vendor for inducing the purchase by the other coadventurers, is such a breach of confidence as amounts to constructive fraud, and will entitle his coadventurers either to rescind the contract, or to maintain an action for damages for fraud and deceit against either or both parties to the secret understanding, or

to have the coadventurer receiving the benefit account to his associates in the enterprise. [Citations.]'' (*Menefee* v. *Oxnam* (1919) 42 Cal.App. 81, 86 [183 P. 379].)

The record reflects that the real estate broker who negotiated the sale which was eventually consummated by the investors for the account of the joint venture, paid $1,000 to Goldhammer, who in turn gave Alfinito one-half. In October 1961, on the advice of counsel, Alfinito turned his $500 over to Pollock for the account of the joint venture.

Goldhammer, although conceding the receipt of this sum, has been incorrigible. He indicated that he felt no moral obligation to turn the money over to the joint venture; that he would be crazy to account for the sum; and that Alfinito was a chump to pay it over. In the Goldhammer case the trial court found: ''that any improper conduct of the plaintiffs prior to, or at the time of the making of the Alviso joint venture agreement, or in receiving any monies from the real estate broker who handled the sale of the Alviso property, did not destroy the legitimate purposes of the Alviso Avenue joint venture agreement, nor did such conduct of plaintiffs relieve defendants of their fiduciary duty to plaintiffs with respect to their transferring to plaintiffs their one-fourth ($\frac{1}{4}$) interest in the Alviso property as required by the joint venture agreement; . . . .''

The investors contend that the evidence and the foregoing finding reflect unconscientious conduct upon the part of Goldhammer which is connected with the controversy, and that therefore the trial court erred in that it should have denied him relief. (See *DeGarmo* v. *Goldman* (1942) 19 Cal.2d 755, 764-765 [123 P.2d 1].) ''The burden is on the one coming into a court of equity for relief to prove not only his legal rights but his clean hands, and he may not rely on any deficiencies that may be laid at the door of the defendants. [Citations.]'' (*Id.*, p. 765.) Nevertheless, ''A person is not placed forever entirely outside the protection of the law in a particular transaction, because, forsooth, some time in the distant past he was guilty of an improper act. The claimed fraud should have been and was weighed by the court, and it found that the equities in favor of respondent far outweighed those in favor of appellant. With this conclusion we agree.'' (*Nealis* v. *Carlson* (1950) 98 Cal.App.2d 65, 69 [219 P.2d 56].)

In the instant case the investors knew that Goldhammer had received and retained the $500. They never demanded the money from him or attempted to rescind the agree-

ment because of his fraud. Having waived the right to rescind the agreement they sought its advantages, and should not now be able to assert the alleged fraud to defeat the rights the developers would otherwise have. (See *Soon* v. *Beckman* (1965) 234 Cal.App.2d 33, 35-36 [44 Cal.Rptr. 190] and comment thereon; Witkin, Summary of California Law (1965 Supp.) Equity, § 9A, p. 975.)

The same considerations apply to investors' attempts to apply the clean hands doctrine to the fact that Goldhammer collected and retained some of the rents from the Alice property and from a tenant on the Alviso property. He testified he was holding the rents collected as against such time as the investors would account for the proceeds of the Alice property. The court found: "that any monies received from rentals of the Alviso property by plaintiffs has been accounted to defendants, and that plaintiffs' failure, if any, to turn over any such rentals or monies received did not substantially affect plaintiffs' right to receive and be entitled to the transfer by defendants to plaintiffs of a one-fourth ($\frac{1}{4}$) interest in and to the Alviso property." The trial court properly weighed the equities.

Testimony of the contractor that Goldhammer wanted to build an agricultural building on the property over his coventurers' objections; that he had tried to get the contractor to pad his bills and give him a kickback; and that Goldhammer prior to the trial had attempted to induce the contractor to avoid being questioned in court about the kickbacks was all before the trial court. It could properly evaluate its weight and its effect on the credibility of Goldhammer, and on his right to recover.

It is charged that Alfinito acted in an unconscientious manner because, in addition to the disgorged kickback, he attempted to plot with the investors to squeeze Goldhammer out of the deal. Here again the alleged reprehensible conduct must be weighed against other circumstances in the case, such as the investors' retention and distribution of the Alice property funds without the consent of the developers. The finding in the Alfinitos' case that "plaintiffs did not make secret or fraudulent or any profit which belonged to the joint venture and for which they failed to account" is sustained by the record.

Since the court made express findings on the effect of the facts in issue and granted the relief sought, the developers cannot complain of the failure to make conclusionary findings on the doctrine of clean hands.

*The court did not err in failing
to provide further relief*

It is true as a general principle that "It is the duty of the court in an action for specific performance, when all parties to the controversy are before it, to adjust the rights of all and leave nothing open for future litigation." (45 Cal. Jur.2d, Specific Performance, § 84, pp. 375-376.)

In the present action the investors took the position that the joint venture agreement had never come into existence, or that if it had, all rights of developers under it had terminated. Their attorney expressly disclaimed that the court would be called upon to render an accounting between the parties.

In the absence of a request from any party, the court could not on its own motion launch such an accounting. The court determined that the agreement was valid and existing and enforcible to the extent for which relief had been prayed. It then was up to the parties to decide whether they wished to continue to disagree, or to agree on a plan for further development or disposition of the property. Until that decision was made by the parties, and until its jurisdiction was invoked at the behest of one or more of them, the court had no right to intermeddle in the other rights and obligations of the parties.

The judgments are affirmed.

Sullivan, P. J., and Molinari, J., concurred.